# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOLLY CRAWFORD, | |
| Petitioner, | CIVIL ACTION NO. 1:22-cv-01470 |
| v. | (SAPORITO, J.) |
| LUZERNE COUNTY COURT OF COMMON PLEAS, *et al.*, | |
| Respondents. | |

## MEMORANDUM

Holly Crawford, incarcerated at SCI-Muncy in Muncy, Pennsylvania, proceeds on a petition for writ of habeas corpus submitted pursuant to 28 U.S.C. § 2254. Crawford seeks leave to conduct discovery in support of her petition and requests appointment of counsel. (Docs. 20, 21). Finding that the record, even with Crawford's proposed discovery, does not entitle her to habeas relief, the Court denies Crawford's motions and dismisses the petition.

## I.  STATEMENT OF THE CASE

On September 23, 2015, in the Court of Common Pleas of Luzerne County, a jury convicted Crawford on two counts each of First-Degree Murder and Criminal Conspiracy for the shooting deaths of Ronald

"Barney"[1] Evans and his son Jeffrey Evans. Crawford was sentenced to life imprisonment.

## A. Trial

Briefly summarized[2], the jury heard evidence that on April 21, 2014, Crawford, her boyfriend Daniel Roche, and her mother Moya Linde were watching a movie at Linde's residence, with Crawford's daughter Alexa Balma also in the house. Roche was angry at Ronald Evans because Crawford had a previous intimate relationship with him, and Roche had previously fired a gun toward Evans's house with Crawford present. According to Linde, Crawford drank daily and was "drunk a lot" but "functioned pretty much most of the time." Crawford also had a prescription for Klonopin, and she had made references to Evans "stealing" Klonopin from her purse the previous week.

Balma testified that she could hear the three adults clearly. During a scene in the movie involving gunfire, Balma heard Roche say: "I should

---

[1] Although Ronald Evans is frequently referred to in the trial record as "Barney," for clarity, the Court refers to him by his given name.

[2] The Court's summary of evidence is adapted from the trial court's March 1, 2016, Opinion (Doc. 12-2 at 191-247), and supplemented by the trial transcript (Doc. 12-1 at 34-200, Doc. 12-2 at 1-188).

go over and kill him, shoot him." Crawford, in a "casual" tone, said to Roche: "You should get Jeffrey, too, because he had to put his cat, Bailey, down." Balma then heard Crawford and Roche get into a car and leave.

The following morning, April 22, Crawford told Balma: "I did something very bad. Watch the news. I know you can understand." When Balma returned from school that evening, Crawford told her that "she shot Barney and Jeff in the head," and that "[i]t was just like shooting a deer." On the same day, Crawford called her other daughter, Tristin Crawford, whom she had not seen in "at least 2 years or more," and told her that "something bad happened," and to "watch the news." Later, she told Tristin that "Barney and Jeff had been shot in the head," and again described the shooting as "like a deer."

The next day, April 23, Crawford came into Linde's bedroom and demanded that Linde give her a ride to Philadelphia. Linde declined, but Crawford and Roche took Linde's car keys and credit card and drove away. Linde called the police to report the items as stolen, and at Balma's suggestion, asked the police to perform a welfare check at the Evans residence. Crawford and Roche then returned to Linde's home because they "couldn't get any money" from the card. Crawford overheard the

discussion between Linde and the police and stated to Roche: "We better move. We better leave." Roche retrieved a gun from the basement and Roche and Crawford went "into the woods." Balma heard this exchange, and described Crawford's speech as "a bit slurred, but you [could] understand what she was saying."

Police later found Ronald Evans and Jeffrey Evans in their home shot to death. A broken portion of the trigger guard police recovered from the Evans's home belonged to a firearm that Crawford and Roche had taken from Linde's home. Police later apprehended Crawford and Roche in the woods 150 to 200 yards from Linde's home.

Crawford was interviewed by police on April 23. State Trooper Stephen Polishan testified that she appeared to be sick, with puffy, red eyes, and "was slightly hunched over at different periods." Crawford told police that she had not had alcohol in two days, and denied any symptoms of withdrawal, but said that she was "flu-like sick." Crawford initially denied knowing the Evanses or anything about the incident, but changed her story after police told her that Roche was cooperating with investigators. Ultimately, she told several "variations" of a narrative in which it was Roche who shot the Evanses. In one variation, Roche shot

the Evanses with Crawford not present; in another, Crawford was present but acted as "a decoy . . . like a duck."

Crawford was held at the Luzerne County Correctional Facility ("LCCF"). Another inmate, Margaret Moran, testified that she was Crawford's cellmate for one month and that the two became friends. Shortly after arrival at the jail, Crawford had been transferred to Moran's cell block "because she had been claiming to see things and hear things." Moran observed that "[o]ver a matter of two of three days, [Crawford] became lucid . . . all her symptoms vanished, and she was acting like a regular person." Crawford told Moran that she and Roche had been planning to kill Ronald Evans and were in "constant" discussion over this plan. Crawford frequently discussed her case with Moran, who had been diagnosed with bipolar disorder, PTSD, and borderline personality disorder. Crawford asked Moran questions about "what would one tell a psychiatrist or psychologist to get a certain diagnosis." According to Moran, Crawford acknowledged that the Evanses had not taken Klonopin from her, but that she fabricated a story about retrieving her own Klonopin from Evans as a defense.

Crawford testified in her own defense, stating that she never

planned or intended for the Evanses to be killed. She testified that Roche was an abusive boyfriend who had choked her approximately ten times, one of which resulted in her going to a hospital, and physically assaulted her in other ways. Roche was jealous of her relationship with Ronald Evans, which Crawford maintained in exchange for money, marijuana, and other gifts.

Crawford described that she was a frequent user of alcohol and marijuana and had a prescription for Klonopin. On the day of the murder, Crawford had been drinking all day, but had not had Klonopin in seven days. When Roche threatened to kill Ronald Evans during the movie, Crawford did not take the threats seriously because Roche had made similar threats before. Crawford acknowledged that she told Roche words to the effect of "yeah, go kill [Evans]" "to get Roche to calm down, to convince him that him that [Evans] means nothing." She also acknowledged making the remark about killing Jeffrey Evans because of his cat, although it was intended sarcastically.

When Crawford and Roche left Linde's house with two guns, Crawford suggested they drive around looking for deer to hunt. However, Roche wanted to go to the Evans house to recover the Klonopin that the

Evanses had purportedly stolen. On arriving at the Evans house, Roche told Crawford to drive away and pick him up in 20 to 30 minutes. When she returned, Roche was in an agitated state and said that the house was "all shut up" with the lights off. Crawford, afraid that Roche would assault her, agreed to confront Ronald Evans to ask him to return the Klonopin. Roche and Crawford approached the Evans house. Ronald Evans, apparently noticing Roche, went out onto the porch with a gun. While Crawford was distracted, Roche shot Ronald Evans, and then, with Crawford "in shock," Roche "punched out" Jeffrey Evans. Crawford did not recall how Jeffrey Evans was shot.

Crawford testified that, from the time of the shootings until she was apprehended in the woods by the police two days later, she drank "the whole time. Every day. All day." She had no memory of being transported to the police station and described herself as being "wasted" during her recorded statement to police. After the statement to police, she was taken to a hospital, where she received Ativan "for detox," and transported to the LCCF several hours later.

Crawford disputed ever telling her cellmate, Moran, about her case. When asked about the testimony of her daughters, Alexa Birma and

Tristin Crawford, that Holly admitted to shooting the Evanses, Holly Crawford testified that she did not remember the statements but stated: "I don't think they're lying."

### B. Procedural History

Following her conviction, Crawford filed a notice of appeal on December 31, 2015. *See Commonwealth v. Crawford*, No. 2284 MDA 2015 (Pa. Super. Ct.). Her appeal challenged the overall sufficiency of the evidence, and further argued that the trial court erred in admitting certain photographs of the victims, failing to suppress Crawford's statement to police as involuntary, and failing to instruct the jury on the defenses of involuntary manslaughter, ignorance or mistake, duress, and voluntary intoxication. The Pennsylvania Superior Court denied all relief on December 14, 2016. *Commonwealth v. Crawford*, No. 2284 MDA 2015, 2016 WL 7239827. Crawford filed a Petition for Allowance of Appeal, which was denied on May 23, 2017. *Commonwealth v. Crawford*, 641 Pa. 682 (2017).

Crawford filed a Post-Conviction Relief Act ("PCRA") petition on June 12, 2017. Crawford initially sought to proceed *pro se* with standby counsel, but ultimately Crawford was appointed a different attorney, who

did not pursue all claims raised in the original petition. *See Commonwealth v. Crawford*, No. CP-40-CR-0002431-2014 (Luzerne Cty. C.C.P.). At the PCRA hearing on February 24, 2020, Crawford, through counsel, alleged that her trial counsel was ineffective for (1) abandoning a motion for mistrial based on comments made by the prosecutor, and (2) failing to call Roche as a witness in her defense. The court denied relief on June 24, 2020. *See* (Doc. 12-2 at 401-416). Crawford appealed on July 2, 2020, and the Superior Court affirmed on June 3, 2021. *See Commonwealth v. Crawford*, 258 A.3d 493 (Pa. Super. Ct. 2021). Crawford filed a Petition for Allowance of Appeal on July 6, 2021, which was denied on December 8, 2021.[3] Crawford then filed her petition in this Court, pursuant to 28 U.S.C. § 2254, on September 20, 2022.

## C. Habeas Claims Presented

In the instant petition, Crawford asserts seven grounds for relief:

- (1) Crawford's trial counsel was ineffective for "eliminating [her]

---

[3] The Court's review of the PCRA appellate docket confirms that Crawford filed a Petition for Allowance of Appeal, despite the respondent's statement that "[i]t does not appear that a PAA was filed." *See* (Doc. 12 at 13); *Commonwealth v. Crawford*, No. 903 MDA 2020 (Pa. Super. Ct.). Further, Crawford attached the order denying the Petition to her traverse. (Doc. 15-1 at 1). Crawford's petition to this Court was timely filed on September 20, 2022, within 365 days of the December 8, 2021, denial of the Petition for Allowance of Appeal. *See* 28 U.S.C. § 2244(d)(1).

entire planned defense and expert witness regarding diminished mental capacity."

- (2) Crawford's trial counsel was ineffective for failing to present this evidence of her diminished mental capacity in support of her motion to suppress Crawford's statements to police.

- (3) "Prosecutorial misconduct for stating [three] times at trial that [Crawford] fabricated [her] defense once [she] obtained an attorney."

- (4) Crawford's trial counsel was ineffective for failing to call her boyfriend and co-defendant, James Roche, as a witness at trial.

- (5) Crawford's trial counsel was ineffective for failing to "pursu[e] the testing of physical evidence, samples and swabs."

- (6) The trial court erred by denying Crawford's requested jury instructions on involuntary manslaughter, mistake of fact, duress, and voluntary intoxication.

- (7) The jury "deliberated with the misinformation that Jeffrey Evans was gunned down in his home," when in fact Jeffrey Evans lived next door.

## II.  LEGAL STANDARDS

A federal court may not grant relief on habeas claims previously adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d). In drafting this statute, Congress "plainly sought to ensure a level of 'deference to the determinations of state courts,' provided those determinations did not conflict with federal law or apply federal law in an unreasonable way." *Williams v. Taylor*, 529 U.S. 362, 386 (2000); *see also Eley v. Erickson*, 712 F.3d 837, 846 (3d. Cir. 2013). Consequently, "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated." *Williams*, 529 U.S. at 387. "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be [objectively] unreasonable." *Id.* at 411; *see also Eley*, 712 F.3d at 846. Moreover, any factual findings by the state trial and appellate courts are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013); *Eley*, 712 F.3d at 846.

Subject to limited exceptions, the petitioner must first exhaust all claims in state court. *See* 28 U.S.C. § 2254(b),(c). A state prisoner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the state's established appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). A claim has been exhausted when it has been "fairly presented" to the state court, meaning that the court has addressed it on the merits. *Picard v. Connor*, 404 U.S. 270, 275 (1971). The petitioner bears the burden of proving exhaustion of all available state remedies. *Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005) (citing *Toulson v. Beyer*, 987 F.2d 984, 987 (3d Cir. 1993)).

As for Crawford's requests for discovery, a habeas petitioner may be authorized to conduct discovery for "good cause." *See* Rule 6(a), 28 U.S.C. foll. § 2254. Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate" entitlement to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). The court can also "direct the parties to expand the record by submitting additional materials relating to the petition." Rule

7(a), 28 U.S.C. foll. § 2254. The party against whom these materials are offered must have "an opportunity to admit or deny their correctness." Rule 7(c), 28 U.S.C. foll. § 2254.

## III.    DISCUSSION

Crawford admits that many of her grounds for relief were not presented to the state courts, but she argues that the Court should consider them on their merits because her counsel refused to pursue them. A client's disagreement with counsel's judgment not to pursue a ground for relief does not itself show "cause" to excuse procedural default. *See Hodge v. United States*, 554 F.3d 372, 379 (3d Cir. 2009); *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000). However, "counsel's failure to raise an ineffective assistance claim on collateral review may excuse a procedural default if: '(1) collateral attack counsel's failure itself constituted ineffective assistance of counsel under *Strickland*, and (2) the underlying ineffective assistance claim is a substantial one.'" *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 237-38 (3d Cir. 2017) (quoting *Martinez v. Ryan*, 566 U.S. 1, 14 (2012)). Accordingly, the Court will consider Crawford's exhausted claims and her unexhausted ineffective

assistance claims, with reference to Crawford's proposed discovery[4] as she describes it.

For an ineffective assistance claim, a petitioner must prove "(1) that [her] counsel's performance was deficient, that is, it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced" the client, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688-89, 694 (1984). By this standard, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

### A. Evidence of Diminished Mental Capacity (Grounds 1 and 2)

First, Crawford asserts that trial counsel was ineffective for

---

[4] In her discovery motion, Crawford requests that the Court "obtain [and] review" 30 different documents or categories of documents. The Court finds no good cause to expand the record, for the reasons described herein, but addresses several of these requests in discussing the corresponding grounds for relief.

"eliminat[ing Crawford's] entire planned defense" of diminished mental capacity. Crawford alleges that at the time of her inculpatory statements to family and police, she was in "a delusional state due to Klon[o]pin withdrawal and alcoholism." She further alleges that "much evidence was collected by trial counsel," and an expert witness retained, but counsel failed to present this evidence at trial. These grounds were unexhausted, so she must show that her collateral attack counsel was ineffective and that the underlying claim is "substantial," *i.e.*, that it has "some merit." *Bey*, 856 F.3d at 237-38.

According to Crawford, the missing evidence included the fact that on April 24, shortly after her arrival at the LCCF, she was taken to the infirmary and experienced anxiety, tremors, "seizing," and vomiting. On April 26, she was taken for psychiatric observation due to hallucinations, and her symptoms included "talking to those not there, climbing all over, standing in toilet with shoes on, hanging on door's bars, screaming for family members, playing in toilet, screaming for help for 9 hours." Jail records indicate that she was placed on suicide watch. On April 27, she was placed in a "restraint chair" for two hours, and continued "twitching, jerking, talking to those not there." These symptoms continued, in a less

severe form, through May 2, when "medication progress notes" allegedly show her mood as "anxious," insight "fair/poor," perceptions "delusional," and thinking "impaired." *See* (Doc. 15 at 5-8, Doc. 15-1 at 8-9, 22-25). Crawford seeks leave to conduct discovery to obtain the corresponding records.[5]

The record is clear that counsel did not "abandon" Crawford's defense of diminished capacity. Counsel adduced evidence of Crawford's alcohol and drug abuse, particularly her alcohol use between April 21 and 23, and repeatedly argued that Crawford's statements to police and her family were made in a state of intoxication. Crawford objects that counsel did not introduce the LCCF records, which she argues "clearly depict[]" a diminished mental capacity and delusional state "that began prior to the homicides" on April 21. However, there were apparent strategic reasons not to do so, which undermine any argument that collateral attack counsel was ineffective for failing to pursue this claim.

The timing of Crawford's symptoms at the LCCF did not align with

---

[5] Crawford produces some LCCF medical records, and supplements these with handwritten, detailed accounts of her condition during this period, which she alleges are reflected in other medical records. The Court's description is itself only a summary of these allegations.

the other evidence. Although Crawford attributes her severe condition at the jail to Klonopin withdrawal, she testified that she had not used Klonopin for seven days prior to the murders, and the prosecution's toxicologist testified that the half-life of Klonopin was 35 hours, meaning "it would take probably five to six days for that to be out of your system." (Tr. 756-57, 933-34).[6] Crawford disputes that statement as "misinformation," but does not point to any evidence (presented at trial or otherwise) contradicting it.[7] To the extent her symptoms at the jail were caused by withdrawal from alcohol, that would have hurt her case, because the record indicated that she was drinking (and presumably not suffering alcohol withdrawal) between April 21 and 23.

---

[6] When citing to specific portions of the trial and hearing transcripts, the Court refers to the page numbers originally provided in those documents. All other references to the record are cited as paginated by CM/ECF.

[7] In his opening statement, defense counsel claimed a defense expert could testify that "you're not supposed to mix Benzos with alcohol, because that only makes you worse." *See* (Tr. 44). As noted, that expert was never called, and the point was of questionable relevance given Crawford's testimony that she had not taken Klonopin for seven days prior to the murders. As further described below, counsel apparently sought to establish Crawford's intoxication through eyewitness testimony, rather than toxicology, because the record lacked clear quantitative evidence that she was intoxicated.

The records themselves, by Crawford's own description, do not address her mental state prior to April 24, and do not document hallucinations or delusions until April 26. Crawford essentially describes a highly distressed state of manic behavior, but there was no evidence of such severe illness between April 21 and 23; to the contrary, her family generally described her as calm or even "casual" during that time. The jury may have inferred that she was malingering at the LCCF, given Moran's testimony to that effect. Further, evidence of a "delusional state" of that severity would have undermined the credibility of her own testimony about the events, including her detailed recitation that she was an unwitting bystander to the murder, making sarcastic and/or pacifying remarks to dissuade Roche.

Against this backdrop, there were clear strategic reasons not to introduce the jail medical records. Counsel instead introduced drug screening tests from intake at the LCCF, which were positive for alcohol, benzodiazepines[8] and THC, as well as evidence of Crawford's DUI arrests

---

[8] *See* (Tr. 817-821). Crawford received Ativan, a benzodiazepine, at the hospital hours prior to intake. However, it was undisputed that the screening tests did not speak to the amount of the drug(s) in Crawford's system, nor show that she was intoxicated. *See* (Tr. 848).

from 2013, during which she showed blood-alcohol levels of .191 and .31 (Tr. 836-37). Counsel sought to portray Crawford as a long-term "dysfunctional alcoholic" who drank continuously to escape the problems posed by her abusive boyfriend and was therefore "generally confused" and "prone to delusional statements."[9] *See*, *e.g.*, (Tr. 370-71, 719-720). At closing, counsel urged the jury not to focus on what substance caused her intoxication between April 21 and 23, acknowledging that the evidence did not clearly show the precise means, but to consider witness testimony that at various points she appeared tired, intoxicated, and/or confused. *See* (Tr. 998, 1014-15). Although another attorney may have presented this defense differently, the record does not show that trial counsel abandoned it, nor suggest a reasonable probability that Crawford's new evidence would have changed the result. Counsel apparently elected not to present this evidence after what Crawford concedes was ample

---

[9] By stipulation, counsel introduced receipts from purchases of a half gallon of vodka on each of April 21, 22, and 23. *See* (Tr. 841-43). Even this evidence was ambiguous as to Crawford's level of intoxication. Crawford testified that she purchased alcohol on the morning of April 23 because they had none, but police found Crawford and Roche at 3:30 p.m. with a significant quantity of alcohol, which seemed to contradict her testimony that she had been drinking continuously before she gave her statement to police. *See* (Tr. 1033).

investigation and preparation, a decision which is "virtually unchallengeable" in an ineffective assistance claim. *Strickland*, 466 U.S. at 690-91. Accordingly, collateral attack counsel was not ineffective for failing to pursue this claim.

Much of the same reasoning applies to the introduction of this evidence at the suppression hearing, which is Crawford's second argument for relief.[10] Crawford moved to suppress her April 23 statements to police, including a 22-minute audio-recorded statement. Counsel presented testimony to contest the statements as involuntary[11], but did not introduce records of Crawford's medical treatment in jail, and the trial court denied the motion.

In addition to the strategic considerations cited above, there was no

---

[10] Although Crawford claims proper exhaustion because appellate counsel litigated her claim that the trial court erred in denying the motion to suppress (Doc. 15 at 10), the specific grounds she asserts here – *i.e.*, counsel's ineffectiveness specifically for failure to introduce additional evidence – were unexhausted.

[11] Among other points, counsel adduced testimony that the *Miranda* warning was not sufficiently specific; that Crawford appeared tired and sick and had to lie down during breaks in the interview; and that she was distressed because she was not wearing a device she ordinarily uses to address her irregular heartbeat. *See* (Suppression Tr. 13-79).

reasonable probability that suppression of Crawford's statements to police would have changed the outcome of the trial.[12] Crawford explicitly concedes that her audio-recorded statement "is in itself not incriminating" (Doc. 15 at 12), but objects that Polishan was permitted to "falsely" testify that separately from the recorded statement, Crawford told Polishan her role in the murder was to be "a decoy . . . like a duck." *See* (Tr. 136). Crawford argues that the prejudice from this remark was significant because it suggested premeditation, but the inference of premeditation was supported, on grounds totally unrelated to the "decoy" comment, by the testimony of at least four other witnesses (Linde, Balma, Tristin Crawford, and Moran).

---

[12] Crawford's argument that the outcome of the motion to suppress could have been different is insufficient. *See Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005) ("Thomas must show that he would likely have prevailed on the suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted.") (citations omitted); *United States v. Mercer*, No. 4:04-CR-0135, 2009 WL 82478, at *3 (M.D. Pa. Jan. 9, 2009) ("Even if we indulge the assumption that the motion to suppress would have been successful, it would not have affected the outcome of the trial.").

## B. Prosecutorial Misconduct (Ground 3)

Crawford describes her third ground as "prosecutorial misconduct" based on statements made during opening and closing arguments. This argument was exhausted by PCRA counsel in the form of an ineffective assistance claim; *i.e.*, that trial counsel was ineffective for abandoning a motion for mistrial based on the allegedly improper statements. However, Crawford argues the arguments made in her appellate and PCRA filings served to exhaust an underlying claim for prosecutorial misconduct. The Court finds that Crawford's and counsel's arguments sufficiently described the "factual and legal substance" of this claim, and essentially required the state courts to evaluate the propriety of the remarks, such that the claim was "fairly presented" to the state courts. *See McCandless*, 172 F.3d at 261. Therefore, the Court analyzes this ground as a prosecutorial misconduct claim as well as an ineffective assistance claim.

Crawford argues that the statements were unfairly prejudicial because they improperly implied that she fabricated her defense after retaining an attorney. The challenged statements included the following, during opening statements:

> "You're going to hear from her friend Margaret Moran . . . [Crawford] tells [Moran] three different versions of

> what happened that night . . . [t]he second version, you'll hear from Margaret Moran that this is after she has an attorney . . . [Ronald Evans] threatens to kill either [Crawford] or [Roche]. So, [Roche] shoots him . . . again[,] self-defense? Justification? She has an attorney."[13]

(Tr. 34-35). During closing statements, the prosecutor remarked:

> "He takes things from around the house to make it look like a robbery, which they then abandon this theory once they get lawyers. Now they're going for mental deficit, drinking, drugs . . . [t]hey also add this lame self-defense, [Ronald Evans] had a gun."

(Tr. 1076). Defense counsel objected to the latter statement as an impermissible comment "about changing their story as a result of obtaining lawyers. It's about a defendant's right to counsel." (Tr. 1077). At the conclusion of the argument, counsel moved for a mistrial. Both counsel and the judge reviewed the remarks as recorded by the stenographer. Upon review, counsel withdrew the motion, stating that he had "quoted [the prosecutor] out of context," but requested a curative instruction. (Tr. 1085-88). All counsel agreed that a curative instruction would be read at the beginning of the charge to the jury. In pertinent part,

---

[13] Although somewhat unclear from the transcript, it appears that the prosecutor sought to contrast Crawford's "first version" of events, that Crawford actively planned to kill Ronald Evans, with her "second version," that the murders were unplanned and only occurred because Ronald Evans emerged from his house with a gun. *See* (Tr. 34-35).

the instruction read:

> During the Commonwealth's closing yesterday . . . [t]he Assistant District Attorney argued that Margaret Moran stated, "James Roche takes things from around the house to make it look like a robbery which they then abandon this theory once they get lawyers."
>
> I'm instructing you, that the Assistant District Attorney did not suggest, and you may not infer, that Defense Counsel acted unethically or inappropriately or were requested to engage in any misconduct by the Defendant. The reference to lawyers, was allegedly made by the Defendant to Margaret Moran and you may not infer anything adverse about Holly Crawford obtaining lawyers, as it is her Constitutional Right to present a defense.

(Tr. 1097).

At the PCRA hearing, Crawford's defense attorney Jonathan Blum[14] conceded that if in fact Moran had not testified that Crawford changed her story after meeting with her lawyers, the prosecutor's remark was inappropriate, the motion "should have been maintained," and the curative instruction was "improper." Regardless, Attorney Blum "would have liked a stronger or different instruction, but apparently

---

[14] Attorney Blum was not the member of the defense team who made, argued, and ultimately withdrew the motion for mistrial; that attorney, William Ruzzo, died prior to the PCRA hearing. *See* (PCRA Tr. 40-41).

that's what we settled on." (PCRA Tr. 42-45).

The trial court denied relief. The court found that the remarks during the opening statement were appropriate "based on the evidence that [Moran] would testify to at trial," specifically, the "chronology of [Crawford's] changing versions of the murders." As for the remarks during closing, the court found that they were a "permissible attack[] on [Crawford's] credibility, based on Ms. Moran's testimony. At no point did Ms. Moran or the Prosecutor claim that trial counsel collaborated with Defendant in fabricating a defense, nor was it the Prosecutor's intention." Ultimately, the "brief comments did not improperly sway the jury's focus and did not inflame or mislead the jury to such a degree as to warrant a new trial, as the Commonwealth's evidence was overwhelming and statements aimed at the Defense's theory does not constitute prosecutorial misconduct." Further, the court found that the curative instruction addressed any prejudice from the remarks. *See* (Doc. 15-2 at 409-416). The Superior Court affirmed, finding that the remarks were proper and the curative instruction was an "appropriate and reasonable" response by counsel. (*Id.* at 513-17).

Upon review, the courts' discussion of this issue may have been

incomplete. Although Moran did testify as to Crawford's shifting stories about the murder, Moran made no mention of Crawford's lawyers. *See* (Tr. 612-675). Thus, the prosecutor's remark during the opening statement was an explicit misstatement of the evidence to follow. *See* (Tr. 34) ("The second version, *you'll hear from Margaret Moran that this is after she has an attorney . . .*") (emphasis added). And while the court found the closing statements to be "permissible . . . based [on] Moran's testimony," Moran's testimony provided no basis to infer that Crawford and Roche abandoned a prior theory of defense "once they [got] lawyers."

However, even if the Court were to infer an "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), any such error was harmless. A court must not grant habeas relief for an unreasonable determination of fact if the underlying claim involves (1) "a trial error—meaning an error that 'occur[s] during the presentation of the case' . . . and can 'be quantitatively assessed in the context of other evidence presented in order to determine' harmlessness," and (2) the error did not result in "actual prejudice" to the petitioner. *Lacombe v. Warden James T. Vaughn Corr. Ctr.*, 95 F.4th 127, 135 (3d Cir. 2024) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629-30, 637 (1993)). "Actual prejudice" means

that the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (citation omitted). The same harmless error analysis would apply to Crawford's claim of prosecutorial misconduct. *See Marshall v. Hendricks*, 307 F.3d 36, 70-72 (3d Cir. 2002).

Despite any error in analyzing Moran's testimony, the ultimate conclusion that the prosecutor's statements did not violate Crawford's constitutional rights was well-supported. Overall, the prosecution sought to attack Crawford's credibility based on her changing stories as told to various witnesses. There was ample evidence to support that theory, independent of any improper remarks. Moran had (permissibly) testified that Crawford was fabricating her defense; there is no reason to believe that the two stray references to "lawyers," although arguably inappropriate, held any particular significance to the jury in the context of the broader argument. *See, e.g., Yelverton v. Thompson*, No. 19-CV-4796, 2025 WL 553355, at *7-8, *13 (E.D. Pa. Feb. 19, 2025) (in view of the other evidence, prosecutor's "stray comment during a several-day trial" did not amount to denial of a fair trial). Further, the parties' agreed curative instruction was prominently placed, and supported by further

instructions that the opening and closing statements were not to be regarded as evidence.

Ultimately, the remarks, and counsel's failure to sustain the motion for mistrial, did not have "a substantial and injurious effect."[15] *Brecht*, 507 U.S. at 637. Although counsel later regretted the defense team's decision to abandon the motion, such "hindsight" does not show ineffective assistance of counsel. *See Marshall*, 307 F.3d at 85. At worst, counsel's treatment of this issue was "an isolated error" that belied their overall performance "indicat[ing] active and capable advocacy." *Harrington v. Richter*, 562 U.S. 86, 111 (2011).

## C. Failure to call James Roche (Ground 4)

Next, Crawford claims ineffective assistance of trial counsel for counsel's failure to call James Roche as a witness. The issue was

---

[15] *See*, *e.g.*, *Rolan v. Coleman*, 680 F.3d 311, 325 (3d Cir. 2012) (trial court "provided adequate instruction to cure any harm caused by the prosecutor's characterizations of the evidence"); *United States v. Rivas*, 493 F.3d 131, 140 (3d Cir. 2007) ("A mistrial is not required where improper remarks were harmless, considering their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction."); *see also Jackson v. Carroll*, 161 F. App'x 190, 194 n.3 (3d Cir. 2005) (where improper testimony did not warrant a mistrial, "defense counsel cannot be faulted for failing to make a request that was not likely to be granted").

exhausted through Crawford's PCRA appeal.

At the PCRA hearing, Roche testified that he wanted to testify in Crawford's defense and would have supported Crawford's version of events. However, that story would have contradicted the version of events he gave to police. Attorney Blum, of Crawford's defense team, identified several issues that weighed against calling Roche. Blum testified that he knew Roche planned to advance a self-defense theory at his own trial, and that part of Crawford's own defense strategy was to distance Crawford from Roche. Further, Blum attempted to interview Roche, but was refused by Roche's attorney, Paul Galante, who remarked that such an interview would be "tantamount to [Roche] pleading guilty," and that he would advise Roche to plead the Fifth Amendment. Galante testified that Roche agreed to this strategy. Therefore, it was unclear that Roche would provide testimony favorable to Crawford. *See* (PCRA Tr. 3-57, 77-86), (Doc. 12-2 at 405-409). The PCRA court denied relief (Doc. 12-2 at 405-09), and the Superior Court affirmed on essentially the same grounds, *i.e.*, that the witness was essentially unavailable, that the absence of his testimony was not clearly prejudicial, and that there were sound strategic reasons not to call him. *See* (*id.* at 511-13).

The Court finds no unreasonable application of federal law, given that the decision not to call Roche was a legitimate strategic choice supported by thorough investigation. *See Strickland*, 466 U.S. at 690-91. To the extent the decision relied on crediting the hearing testimony of Attorneys Blum and Galante in contradiction to the testimony of Roche himself, that factual determination was "objectively []reasonable in light of the evidence presented," *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), particularly given Roche's shifting stories.

### D. Testing of Physical Evidence (Ground 5)

Next, Crawford argues that trial counsel was ineffective for not arranging to test Ronald Evans's handgun, which Crawford and Roche took with them after the murder. Crawford alleges that Roche took Evans's gun, which was "covered with blood," and placed it in her hand. However, the police did not find blood on the gun. Crawford argues that DNA testing of swabs from Evans's gun would have demonstrated the presence of blood on the gun, and thus (1) "substantiated [Crawford's] theory that [Evans] was brandishing the firearm at Roche," and (2) defeated the prosecution's "heavy inference" that the presence of two guns at the scene established Crawford's intent to kill. For the same

reasons, Crawford argues that counsel should have arranged to test Linde's car for blood. *See* (Doc. 1 at 20-22).

Crawford concedes that the issue was unexhausted because it was "abandoned" by PCRA counsel; therefore, she would have to show that PCRA counsel's failure to pursue the issue constituted ineffective assistance of counsel, and that the underlying ineffective assistance claim was "substantial." *Bey*, 856 F.3d at 237-38.

Crawford has not established either element. According to Crawford, her PCRA counsel declined to pursue the issue because "we cannot get the gun tested for multiple reasons. First, the funding is impossible – we looked around and the cost would exceed $15K. Since discovery is presumptively not allowed in PCRA proceedings, my judgment here is to forgo this strategy for now . . ." (Doc. 15-1 at 20)[16]; *see* Pa. R. Crim. P. 902(E)(1) ("[N]o discovery shall be permitted at any stage of the [PCRA] proceedings, except upon leave of court after a showing of exceptional circumstances."). PCRA counsel was not

---

[16] As with Crawford's jail medical records, she provides what she alleges is a verbatim account of counsel's reasoning. The Court finds no good cause to order discovery to obtain the communication itself, because Crawford's specific allegations of the content would not entitle her to relief.

ineffective for declining to pursue discovery under these circumstances.

Nor does Crawford's proposed evidence show that the underlying claim would have had merit. The prosecution's theory of intent was not premised on Crawford's possession of Evans's .44 revolver, but on the two .22 rifles that Crawford and Roche brought to the scene with them, including Linde's .22 rifle, which Crawford contends was broken but which the prosecution contended was still operative. *See* (Tr. 1069-1074). Crawford's argument here is a double-edged sword: if she had claimed at trial that the presence of Evans's blood on the .44 proved that he brandished it, that would undermine her own criticism of the prosecution's inference that Linde's .22 only had blood on it because it was used at the scene. *See* (Doc. 1 at 21; Tr. 443-444). Moreover, the purported dearth of forensic evidence "left trial counsel free to argue that the prosecution's case was entirely circumstantial . . . [T]rial counsel's strategy failed, but a failed strategy does not establish that trial counsel's strategy was unreasonable." *Chambers v. Beard*, No. 3:06-CV-980, 2009 WL 2191748, at *27 (M.D. Pa. July 22, 2009), aff'd, 442 F. App'x 650 (3d

Cir. 2011); *see* (Tr. 999-1001).[17]

### E. Jury Instructions on Defenses (Ground 6)

Next, Crawford argues that the trial court erred by not instructing the jury on the defenses of involuntary manslaughter, mistake of fact, voluntary intoxication, and duress. Broadly summarized, the state courts denied Crawford instructions on these defenses, and denied relief on appeal, because Crawford's own testimony that she was not involved with the murders was inconsistent with each defense. *See* (Tr. 978-79); (Doc. 12-2 at 320-33).

The Court finds no unreasonable application of federal law or unreasonable determination of the facts in the state courts' analysis. When a Section 2254 petitioner challenges a ruling on jury instruction, "[t]he only question for [the federal court] is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62, 71-72

---

[17] Crawford requests that the Court obtain her other PCRA filings for further development of her argument. Noting that Crawford's existing petition and briefing describe her position at length (Doc. 1 at 20-22, Doc. 15 at 25-29), and that the existing record forecloses any relief for the reasons described herein, the Court does not find good cause to further supplement the record with additional argument.

(1991) (quotation and citations omitted); *see Jones v. Delbaso*, No. 16-CV-5634, 2018 WL 8344331, at \*5 (E.D. Pa. Oct. 31, 2018). Crawford argues that the facts of her case could have been construed to fit the various defenses, but those arguments over the interpretation of state law would not entitle her to federal habeas relief. There is no basis to infer that the allegedly erroneous ruling on jury instructions "operated to lift the burden of proof on an essential element of an offense," as would be required to show a Due Process violation. *Smith v. Horn*, 120 F.3d 400, 416 (1997); *see also Jackson v. Hendricks,* No. 04-CIV.A.-2145(AET), 2006 WL 1307655, at \*23 (D.N.J. May 8, 2006) ("Questions relating to jury charges are normally matters of state law and are not cognizable in federal habeas review.").

### F. "Misinformation" as to Jeffrey Evans (Ground 7)

Finally, Crawford argues that the jury "deliberated with the misinformation that Jeff Evans was gunned down in his home." Essentially, Crawford alleges that Jeffrey Evans lived next door, that she did not know he would be there, and therefore "[i]t is impossible to find the elements required for First Degree Murder." The legal basis for the

argument is unclear[18], but regardless, the claim was unexhausted, and Crawford offers no basis to excuse exhaustion. *See Shinn v. Ramirez*, 596 U.S. 366, 379 (2022) (petitioner must show cause for procedural default and actual prejudice from the alleged violation).

## IV.  CONCLUSION

Accordingly, the Court will dismiss Crawford's petition and deny her motions for discovery and appointment of counsel. Because Crawford has not demonstrated "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), no certificate of appealability will issue. *See Buck v. Davis*, 580 U.S. 100, 115 (2017); *Miller-El*, 537 U.S. at 327. An appropriate order follows.

Dated: March 25, 2025                    *s/Joseph F. Saporito, Jr.*
                                         JOSEPH F. SAPORITO, JR.
                                         United States District Judge

---

[18] "It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder," which can be established by "the use of a deadly weapon on a vital part of a human body." *Commonwealth v. Simpson*, 562 Pa. 255, 265 (2000).